UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

KURT E. RENT,                              )
             Plaintiff,                    )
                                  )
    vs.                                          )               1:04-cv-0359 RLY/WTL
                                    )
AMTRAK,                                    )
             Defendant.                 )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Plaintiff Kurt Rent, an African American, has filed suit against his employer,

Defendant Amtrak.  Rent alleges that he was discriminated against based on his race and

retaliated against because he reported Amtrak practices that he believed were dangerous.

The matter is now before the court on Amtrak's Motion for Summary Judgment.  For the

following reasons, Amtrak's motion is **granted**.

**I.      Summary Judgment Standard**

      Summary Judgment is warranted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it is outcome determinative.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine "only

when a reasonable jury could find for the party opposing the motion based on the record

as a whole."  *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Industries, Inc.*,  17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322).

## II.    Facts

Rent has objected to thirty four of the facts proposed by Amtrak. His objection is made simply "on the basis of the pleadings, discovery responses, admission, and the Affidavit of Kurt E. Rent." (Response at 4).[1] This is a violation of Local Rule 56.1(b), which requires that a summary judgment response brief include a statement of facts in dispute, "identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment. These facts shall be supported by appropriate citations" to the record.

---

[1] Notably, even Rent's affidavit was improperly submitted, with an electronic rather than a handwritten signature. Local Rule 5.11 requires that "[d]ocuments requiring a signature other than that of Filing User must bear an original handwritten signature and must be scanned into PDF for electronic filing." S.D.Ind.L.R. 5.11. The court will disregard this oversight, because it does not affect the outcome of Amtrak's Motion for Summary Judgment. However, Plaintiff's counsel is ordered to comply with all Local Rules henceforth.

S.D.Ind.L.R. 56.1.  Rent offers no support for his objections, and in his "additional statement of material facts supported by Plaintiff's designated evidence," he relies almost exclusively on Amtrak's statement of facts and his own affidavit.  His references to the affidavit are to the document as a whole, rather than by page or paragraph.  (*See, e.g.*, Response at 6 ¶ 16, 7 ¶¶ 24, 26).

"It is the parties' duty to package, present, and support their arguments, and we shall not waste our time searching in vain for a dispute of material fact if we come across a factual contention or denial not adequately supported in the record by citation to admissible evidence."  *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Illinois*,  424 F.3d 659, 664 (7th Cir. 2005).  With this in mind, and viewing the record in the light most favorable to Rent, the court finds the following.

### A.    Background

1.    The Amtrak facility in Beech Grove, Indiana is a national maintenance hub for refurbishing passenger cars.  (Tab 1, p. 13).[2]

2.    Rent has worked for Amtrak since May of 1979 and has been a Machinist for the majority of his career at Amtrak.  (Tab 1, pp. 21-22).

3.    Rent is a member of the International Association of Machinists and Aerospace Workers ("IAM").  IAM members are governed by a Collective Bargaining Agreement ("CBA").  (Tab 1, pp. 17, 19-20; Tab 2, ¶ 5).

---

[2] For purposes of this Entry, the court has adopted the citation system used by the parties, which references the tabbed evidence submitted by Defendant.

4.      Rent started in Amtrak's Air Brake Shop in 1980.  (Tab 1, p. 27).

5.      Amtrak's Maintenance and Instruction Manual, Association of American Railroad

Manual of Standards and Recommended Practices, and OEM Repair Procedures of

Air Brake Components govern the procedures that must be followed in

refurbishing the air brake valves.  (Tab 3, ¶ 5 and attached Exhibits 1, pp. 1-3;

Exhibit 2, p. 3 and Exhibit 3, p. 8, respectively).

6.      For the first five to six years, Rent's foreman in the Air Brake Shop was Bill

Kolacek, who is white.  In 2002 Rent's foreman was Tom Kerr, who is white.

(Tab 1, p.28, Tab 3, ¶ 4).  Rent testified in his deposition that his failure to be

promoted to the Foreman of the Air Brake Shop instead of Kerr is not part of his

claim for discrimination.  (Tab 1, pp. 95-96).

7.      Halfway through his tenure in the Air Brake Shop, Rent was promoted to Lead

Machinist.  (Tab 1, p. 29).  As Lead Machinist, Rent's responsibility was to teach

and instruct the other Machinists in the Air Brake Shop in all phases of air brake

car components.  He did not have supervisory or disciplinary authority over the

other Machinists. (Tab 1, pp. 32, 34).

9.      The Federal Railroad Administration ("FRA"), an agency of the United States

Department of Transportation, and the American Associations of Railroads

regulate the frequency and type of equipment inspections performed by Amtrak.

(Tab 1, p. 80; Tab 6, ¶ 7).

10.     According to the regulations of the FRA, the 26-C air brake valves (also known as

4

"service portions") used on passenger car brake equipment systems must be removed from the equipment, disassembled, cleaned, and lubricated every 1476 days.  Any parts that can deteriorate with age, such as rubber parts, are to be replaced. (Tab 6, ¶ 8).

13.    When the air brake valves come into the Air Brake Shop from the field, the Machinists take them through a procedure known as clean, oil, test and stencil ("COT&S").  The paint stencil put on a valve indicates the date the valve passed the test and was put back into inventory ready for service.  From the COT&S stencil and Amtrak's passenger car maintenance schedules, Amtrak can tell when service portions need to be serviced to comply with the 1476 day requirement. (Tab 1, pp. 41, 45; Tab 6, ¶ 12).

14.    To do this, the Machinists disassemble and clean the valve by using cleaning solvent or putting the valve through the Proceco wash, replace the rubber parts on the inside of the valve, grease the valve components, reassemble the valve and test the valve on the test rack to ensure it is functioning properly.  If the valve passes the test, it is marked with a permanent paint stencil stating the date when the COT&S last occurred. (Tab 1, pp. 42, 47, 50).

15.    If any valve fails to pass the test, it has to be reworked and retested until it passes. (Tab 1, p. 55).

16.    A valve may be serviced more frequently than every 1476 days.  For example, a 26-C may have been replaced early because of a malfunction.  Therefore, when the

passenger car is brought in for the regularly scheduled maintenance, it may have a valve that has only been in service for a few months.  If that valve was put on the test rack, it might pass the test because it has not been in service the full 1476 days. Regardless of how long that valve has been in service, it must go through the entire COT&S procedure.  Steps cannot be skipped because the stencil is indicating the entire procedure was done as of the date of the stencil.  (Tab 6, ¶ 13).

17.  It took the average Machinist five hours to perform the COT&S process on any one particular valve.  (Tab 1, p. 75).

18.  Machinists usually worked on more than one valve at a time.  They would work on a second valve while the first was being tested.  In the fall of 2002, Machinists were averaging two valves per day.  (Tab 3, ¶ 7).

   **B.    The OIG Investigation**

19.  In October 2000 Rent reported to his foreman and later to McKim that there was a problem with the test rack.  (Tab 1, pp. 171-172).

20.  Kolacek and the then Lead Machinist tried to fix it but were unsuccessful.  (Tab 1, pp. 170, 175).

22.  In March of 2001 two investigators from the Amtrak Office of the Inspector General ("OIG") visited Amtrak in response to information provided by Rent, and found Rent's claim of problems with the test rack was true.  However, the OIG did not cite Amtrak for the problem, but instead recognized that no one at the Amtrak

facility was trained to correct it.  (Tab 1, p.p. 179, 182).

23.     Shortly thereafter Amtrak employees were trained to correct the problem.  (Tab 1, p. 185).

24.     Neither McKim nor Alderman was ever aware of Rent's complaint to the OIG. (Tab 2, ¶ 16; Tab 5, ¶ 18).[3]

25.     Rent believes that his reporting of this problem to the OIG led to the retaliation he allegedly later experienced starting with the TART team investigation in June of 2002.  (Tab 1, p. 184).

## C.     First Conflict with McDaniel

26.     In June of 2002, Rent got into an altercation with a white co-worker, Machinist Mike McDaniel ("McDaniel").  Rent argued with McDaniel over whether or not a particular valve tank should be thrown away.  McDaniel threw the part away, Rent retrieved it, the two argued, and McDaniel threw the part into Rent's workspace. Eventually McDaniel took the valve tank to Kerr to complain about Rent's behavior.  (Tab 1, pp. 109-115).

30.     Rent recalls McKim telling him that he could not question every decision his Machinists made on the floor.  (Tab 1, p. 116).

---

[3] In his response to Amtrak's Motion for Summary Judgment, Rent admits this fact and then later states that "[i]t strains the imagination to accept Defendant's statement contained in Defendant's Facts ¶¶24, (sic) offering to prove that 'neither [Ray] McKim (Amtrak Air Brake Shop Manager) nor [Ed] Alderman was [e]ver aware of Rent's complaints to the OIG." (Response at 3 ¶ 1; 5 n.1).  Whether or not the statement strains the imagination, Rent has admitted that the fact is not genuinely disputed.

31.  Rent admits that he did not feel the discussion with Kerr and McKim was discriminatory.  However, he did think Amtrak discriminated against him by not taking action against McDaniel for throwing the valve tank.  (Tab 1, p. 118).

32.  If an Amtrak employee is being discriminated against, he can either voice his concern to his union or Amtrak's internal Dispute Resolution Office in Chicago ("DRO"), which will launch an investigation.  Rent is clear on how he can complain of discrimination in the workplace.  (Tab 1, pp. 83-84).

33.  Following the altercation with McDaniel, five Amtrak employees, including McDaniel, complained to Amtrak's Threat Assessment Response Team ("TART") that Rent was acting bizarre and they felt threatened by him.  (Tab 1, pp. 119, 121).

34.  The TART team was charged with receiving complaints regarding and investigating workplace violence.  (Tab 5, ¶ 10).

35.  Two to three days after the valve tank incident the TART team, acting on the five complaints, met with Rent to investigate the complaints.  McKim, as a member of the TART team, attended the meeting. Rent admitted that the TART team was in their right to assess his behavior and character.  (Tab 1, p. 126).

36.  Following the TART team meeting Amtrak Police Chief John Keller, a member of the TART team, advised Rent that the TART team had found all the charges and accusations against Rent to be unfounded.  (Tab 1, p. 125).

37.  Rent never complained during the meeting with Kerr, McDaniel and McKim that

8

he was afraid of McDaniel.  Yet, he considered it discriminatory that McKim

failed to advise the TART team that McDaniel had thrown a valve tank into his

work station.  (Tab 1, pp. 126-127, 130).

38.     McKim did not report the valve throwing incident to the TART team because he

could never verify that it had actually occurred.  (Tab 5, ¶ 11).

39.     During the TART team meeting, Rent told management that Amtrak did not deal

with African-Americans' issues the same way it dealt with whites' issues – that

African-American issues were swept under the table.  (Tab 1, p. 138).

### D.     Administrative Response, August 2002

40.     Ed Alderman ("Alderman"), Amtrak's Charging Officer/Discipline Officer,

reported Rent's concerns to DRO Case Manager Yolanda Scales ("Scales").

Scales attempted to telephone Rent on August 6, 7, 8, and 12, 2002, to discuss his

concerns.  Having no luck she wrote to Rent on August 19, 2002, to invite him to

file a complaint.  She also enclosed a complaint form for him to complete.  (Tab 4,

¶ 6 & 7 and attached Exhibit 1).

41.     On October 4, 2002, Rent was sent another letter by Scales reminding him that the

DRO had yet to receive his complaint and was administratively closing his file.

Scales told Rent he could always revisit the matter within one year of the date of

the incident.  (Tab 4, ¶ 8 and attached Exhibit 2).

### E.     Second Conflict with McDaniel

42.     In November of 2002, Rent claims that when he went outside to blow off a valve

that he had sandblasted, McDaniel intentionally locked him out of the building. (Tab 1, pp. 152-153).

43.    He reported the incident to Kerr and Kerr accompanied Rent to confront McDaniel.  McDaniel acted as if he did not know what Kerr was referring to, and the matter just "dissipated."  (Tab 1, pp. 148-149).

44.    Rent believes that Amtrak did not discipline McDaniel for locking him out because McDaniel was white.  When questioned further about why he thought the lack of discipline was race related, Rent merely stated, "because people of like people tend to stick together."  (Tab 1, pp. 151).

**F.    Safety Glasses**

45.    In mid-November 2002, Kerr approached Rent and told him that he needed to wear his safety glasses.  Rent had them on when he was approached but admitted that the Machinists did not always wear them.  Rent also admitted that he knew he was to wear them at all times. Rent considered this discriminatory.  (Tab 1, pp. 152-154).

47.    Rent testified that McKim later reversed Kerr's warning since Rent had his glasses on when Kerr approached him.  The warning was never placed in Rent's personnel file.  (Tab 1, pp. 157-158).

**G.    Alleged Meeting**

48.    Rent believes that in November of 2002, he had a meeting with Alderman, the union steward Cass Petrowski ("Petrowski"), and the Beech Grove facility General

Manager, Lew Wood ("Wood"), to discuss that he believed he was being discriminated against.   (Tab 1, pp. 159-161).

49.   Alderman does not remember this meeting being in November but recalls discussing with the DRO in August and December of 2002 that Rent was complaining he was being treated differently because of his race.  (Tab 2, ¶ 8).

### H.   Allegedly Discriminatory Valve Inspection

50.   By November of 2002, Kerr had become suspicious of Rent's production. Rent's production figures showed he had only refurbished 14 service portions for the month; whereas the other Machinists had averaged 23.  (Tab 3, ¶ 8 and attached Exhibit 4).

51.   Kerr surmised that Rent was not disassembling and cleaning the valves – a violation of FRA regulations.  Instead he was merely bead-blasting the outside to remove obvious dirt and rust.  If the valves were passing the test on the test rack, he was putting them directly back into inventory without cleaning the insides or replacing the rubber parts.  (Tab 3, ¶ 9).

52.   Kerr went on vacation on November 22, 2002.  Before he left he asked Jim Liddle ("Liddle"), another Lead Machinist, to advise Kerr if any of the valves were missing while Kerr was gone.  (Tab 3, ¶ 10).

54.   Upon Kerr's return he saw Rent take a Superliner service portion from Liddle's rack before Liddle could disassemble and clean it.  He then observed Rent bead-blasting and painting the outside of the Superliner service portion.  After

Rent completed the work on the valve, Kerr noticed he placed it on the carousel to go back to inventory.  Suspicious of the two valves, Kerr pulled the Amfleet and Superliner service portions before they went into inventory and locked them in his office.  (Tab 3, ¶ 12).

55.   When the incidents were reported to McKim, he decided to perform a valve inspection.  (Tab 5, ¶ 13).

56.   McKim asked Kolacek to perform the inspection on December 3, 2002.  (Tab 5, ¶ 14).

57.   On December 3, 2002, Kerr pulled two valves from each Machinist and added Rent's two valves from his office for the inspection.  Kolacek was not told who had refurbished which valves. (Tab 3, ¶ 14).

58.   Rent attempted to remove his pulled valves from the rack before they were inspected, but Kerr ordered them returned.  (Tab 1, pp. 204-205; Tab 3, ¶ 15).

59.   Ten minutes later, Rent appeared in Kerr's office and indicated he was protesting the inspection. (Tab 3, ¶ 16).

59.   Rent alleges that he was not responsible for disassembling, cleaning, lubricating, and inspecting the valves taken from him workstation; rather, he contends that a member of the previous shift was responsible for the valve.  His cites his own complete affidavit, as a whole, in support of this proposition.  Kerr testified that the second shift did not work on 26-C service portions, so the valves in question could not have been worked on the night before by one of Rent's coworkers.  (Tab

3. ¶ 13).

62.    When Kolacek inspected Rent's valves, he determined that the valves had never been disassembled and cleaned but were merely bead-blasted on the outside and repainted.  He had to pry one of the covers off of the valve because there was so much rust, an indication the valve had not been disassembled and cleaned.  He also found metal shavings inside the valve, another indication the valve had not been washed.  (Tab 6, ¶ 15 and attached Exhibit 1; Tab 5, ¶ 15; and Tab 3, ¶ 19).

64.    The stenciling on the valves indicated that one of Rent's service portions had been in the field twelve months and the other three months.  (Tab 6, ¶ 17).

65.    Subsequent to the December 3, 2002 air brake valve inspection, McKim scheduled another random air brake inspection. No further problems were found. (Tab 5, ¶ 17).

66.    In the afternoon of December 3, 2002, Rent was summoned to a meeting in Alderman's office.  Present at the meeting were McKim, McAfee, Cass Petrowski, a union representative, and Lew Wood, Amtrak's General Manager for the Beech Grove facility.  Rent was allowed to give his side of the story.  At the meeting Rent complained of race discrimination. (Tab 1, pp. 227, 230; Tab 2, ¶ 8).

**I.    Formal Investigation**

67.    As a result of the December 3, 2002, inspection, Alderman sent Rent a letter on December 23, 2002, notifying him of a formal investigation for knowingly failing to follow Amtrak's Maintenance and Instruction Manual, Association of American

Railroad Manual of Standards and Recommended Practices, and OEM Repair Procedures of Air Brake Components.  (Tab 1, pp. 231-232 and attached Exhibit 9).

68.    The notification was in three charges: Failure to follow safety standard in Standards of Excellence in the Agreement between the National Railroad Passenger Corporation and the International Association of Machinists and Aerospace Workers (the "CBA"); failure to follow attending to duties standard in Standards of Excellence in the CBA; and failure to follow professional and personal conduct standard in Standards of Excellence in the CBA.  (Tab 1, pp. 231-232 and attached Exhibit 9).

70.    The December 23, 2002 letter advised Rent that he needed to appear for a formal investigation by Amtrak on December 30, 2002, which was later postponed until January 7, 2003.  (Tab 1, pp. 231-234 and attached Exhibits 9 and 11).

71.    The formal investigation was a hearing at which Amtrak would be represented by Alderman and Rent by a union official.  The hearing officer would be from Amtrak's regional office in Chicago.  (Tab 2, ¶ 7).

72.    According to the CBA, an employee can waive the formal investigation if the employee signs a waiver.  Amtrak treats all waivers as admissions of guilt and disciplines employees accordingly.  (Tab 2, ¶ 13).

73.    On January 9, 2003, Rent elected to sign the waiver and admit his guilt rather than go through the formal investigation and hearing.  (Tab 1, p. 244 and attached

14

Exhibit 12).  Rent denies admitting his guilt, but cites only to the waiver in support of his position.  (Response at 10).

74.   As a result, Amtrak suspended Rent without pay for five days and disqualified him from working in the Air Brake Shop for a period of two years. (Tab 2, ¶ 14).

75.   Since no other Lead Machinist positions were open when Rent was disqualified he chose to accept a door closer position in the Power House.  He has worked in that position since 2003.  (Tab 1, p. 256; Tab 2, ¶ 15).

80.   When asked why he believed the air brake valve inspection was racially based, Rent said that Amtrak encourages employees to share their concerns of discrimination with Amtrak, but the company does not really want to hear them. Rent described Amtrak's advice as merely "window dressing."  He stated, "they just didn't dream up – oh let's have an inspection."  Instead he thinks it was in retaliation for voicing his concerns to Alderman.  (Tab 1, pp. 241-242).

**J.   Administrative Response, December 2002**

81.   On December 19, 2002, following Rent's meeting with management and union officials on December 3, 2002, Scales sent Rent a letter advising him that the Business Diversity Department had received word from management that he felt he was being unfairly treated because of his race.  Enclosed in the letter was an Internal Employment Discrimination Complaint form for Rent to complete and submit to the DRO.  Scales indicated if she did not hear back from him by December 31, 2002, she would assume he had decided not to file a complaint.

(Tab 1, p. 103 and attached Exhibit 5; Tab 4, ¶ 10 and attached Exhibit 3).

82.  In response to Scales' letter, Rent called Blanche Cook, an African-American investigator in Amtrak's Chicago DRO office and complained that he was the victim of discrimination.  On December 30, 2002, he followed up with a hand-written narrative to Cook summarizing his complaints.  He complained about the June 2002 altercation with McDaniel that resulted in the TART team investigation; a 1980 altercation with an Amtrak security guard; an incident in November of 2002 when McDaniel locked him out of the Amtrak shop, a reprimand he received in November of 2002 for not wearing his safety goggles; and his January 2003 demotion from the Air Brake Shop.  (Tab 1, pp. 107 and 252 and attached Exhibit 6; Tab 7, ¶ 4).

84.  In the winter and spring of 2003 Cook visited the Beech Grove facility to investigate Rent's complaints.  She conducted live interviews of Rent and twelve other employees and examined documents.  On March 19, 2003, the DRO concluded its investigation finding there was no evidence that Amtrak had violated its Harassment Policy with respect to Rent.  On that same date, Cook notified Rent of the DRO's decision.  (Tab 1, pp. 252-253 and attached Exhibit 13; Tab 7, ¶¶ 5-6, 8-9 and attached Exhibits 1 and 2).

85.   Before Rent filed his December 30, 2002 complaint with the DRO, neither Kerr, McKim, Kolacek, nor Alderman was ever aware of any other complaint Rent had filed with the DRO or the EEOC.  Nor were they aware that Rent was a plaintiff in

16

any class action pending against Amtrak.  (Tab 2, ¶ 16; Tab 3, ¶ 21; Tab 5, ¶ 18; and Tab 6, ¶ 18).

91.    In his Complaint, Rent alleges that he was treated differently than similarly situated white employees.  However when specifically asked to identify the incidents and the identities of the white employees he could not do so.  (Tab 1, pp. 185-194).

92.    The DRO thoroughly investigated the matter, reviewing documents and interviewing witnesses and also could not identify any white comparators to substantiate Rent's claims.  (Tab 7, ¶¶ 4-7 and attached Exhibit 1).

## III.    Analysis

Rent claims that the December 3, 2002 valve inspection that lead to his demotion was a discriminatory "set-up" in response to his reporting safety violations to the OIG in March 2001.  He also claims that his punishment was discriminatory in its severity.  Rent brings his claims under Title VII, 42 U.S.C. § 2000e, et seq.  Under *McDonnell Douglas*, Rent could establish his prima facie case of retaliation either directly or indirectly. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### A.    *McDonnell Douglas*

Rent has failed to establish a prima facia case under the direct method.  There is no direct evidence of discrimination; the only evidence he has submitted is his own self-

serving affidavit.[4]  "It is well established in this Circuit that '[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.'" *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998) (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)). Circumstantial evidence is also admissible under the direct method, "to provide a basis for drawing an inference of intentional discrimination." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).  However, the gap of nearly two years between the OIG report and the valve inspection is too long for the court to infer that the inspection was retaliatory in nature. *Hughes v. Derwinksi*, 967 F.2d 1168, 1175 (7th Cir. 1992) (four months too long).

Rent's case also fails under the indirect method.  In order to establish his prima facie case using the indirect method, Rent would need to show that: "(1) the plaintiff engaged in statutorily protected activity, (2) he performed his job according to the employer's legitimate expectations, (3) he suffered a materially adverse employment action, and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Beamon v. Marshall & Ilsley Trust Co.*,  411 F.3d 854, 861-62 (7th Cir. 2005) (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)); *see also McDonnell Douglas*, 411 U.S. at 802-03.  Rent has not established the second or fourth prongs of the prima facie case.  Regarding the second

---

[4] Rent's "Designation of Evidence" refers to his affidavit as exhibit A and also refers to exhibits B-F, but only the affidavit was filed.  (*See* Docket ## 68, 70).

prong, evidence of Rent's low work output, the valve inspection, and Rent's subsequent waiver of a hearing show that he was not performing his job in a satisfactory manner. And regarding the fourth prong, Rent has offered no evidence to show that any similarly situated white employees were treated differently than he was.[5]  *See Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) ([t]o meet his burden of demonstrating that another employee is "similarly situated," a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects").  Likewise, the waiver and the absence of any comparators invalidates Rent's claim that the severity of his discipline was discriminatory.

### B.   No Remaining Questions of Fact

In his opposition to summary judgment, Rent suggests that four genuine issues of material fact remain.  The first is a question as to Amtrak's credibility during the EEOC investigation of this matter.  The court ruled on this issue in its December 5, 2005, Order, finding in Amtrak's favor.  (Docket # 85).

The second proposed issue is whether the December 3, 2002, valve inspection was

---

[5] Rent has requested leave, pursuant to Federal Rule of Civil Procedure 56(l), to supplement this factual record with affidavits or deposition testimony from some of Rent's coworkers and alleged comparators: Frank Jackson, Derrick Shyrock, and Leonard Adams. (Response at 11 n.4).  There is no Federal Rule of Civil Procedure 56(l); however, pursuant to Rule 56(f), "[s]hould it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot *for reasons stated* present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment . . . ."  Fed. R. Civ. P. 56(f) (emphasis added).  Rent has not stated any reason why these alleged comparators' affidavits are currently unavailable, and Amtrak has objected to the proposed late filings.  (Reply at 8).  Therefore, Rent's request for leave to supplement the record is denied.

premeditated to serve a racial animus.  The court finds no evidence of discriminatory animus in the record; rather, the evidence shows that Rent's valves were singled out because Kerr observed him processing them improperly.  *See* § II(H), *supra*.

Rent's third proposed issue of fact is whether his punishment following the valve inspection was neutral and mandated or race-based.  The waiver and the collective bargaining agreement indicate that the punishment was neutral.  *See* § II(I), *supra*.  Rent's only evidence to the contrary is his own affidavit.

Rent's final proposed issue is that the evidence supports a reasonable "inference that mishaps and misunderstandings between plaintiff and his co-workers and Amtrak management following the OIG investigation were motivated as retaliation for plaintiff's report to federal investigators of serious safety violations occurring in defendant's air brake shop."  (Response at 20).  The only specific examples Rent offers of these "mishaps and misunderstandings" are his being locked out of the shop by McDaniel "as a prank" and his being reprimanded for failure to wear safety glasses.  (Response at 21).  Neither of these incidents supports Rent's claim for retaliation, which is subject to the *McDonnell Douglas* analysis discussed above.

## IV.   Conclusion

Amtrak's Motion for Summary Judgment is **granted**.


Dated: March 17, 2006.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

20

Electronic copies to:

Amy Joan Adolay
KRIEG DEVAULT
aadolay@kdlegal.com

John O'Conner Moss Jr.
MOSS & MOSS
jmjr@mossandmosslaw.com

Marc Josef McCarthy Moss
MOSS LAW, LLC
mmoss@mosslawllc.com

Elizabeth Gardner Russell
KRIEG DEVAULT
egr@kdlegal.com